**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **FGDI, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 03-0588-CG-C** |
| | ) | |
| **M/V LORELAY, and her engines, tackle,** | ) | |
| **furniture and appurtenances, etc., <u>in rem</u>,** | ) | |
| | ) | |
| **Defendant,** | ) | |

<u>**ORDER**</u>

A bench trial was held and testimony was taken in this matter on December 13-14, 2004.   After

a thorough review of the evidence, the court finds that FGDI, L.L.C. is entitled to a total damages award

in the amount of $167,173.33.

<u>**Agreed Facts**</u>

Plaintiff, FGDI, L.L.C., was the operator and long-term lessee of the Alabama State Docks

Grain Elevator located on the right descending bank of the Mobile River.  Claimant, Societe

D'Exploitation du Lorelay, S.A., was the owner of the M/V LORELAY.   On December 7, 2002, the

LORELAY was berthed in the Port of Mobile.  On that date, due to a crack in a bulkhead between a

fuel oil tank and a ballast tank, an oil spill emanated from the LORELAY.  Cleanup operations began,

and the U.S. Coast Guard ordered that, beginning at 0730 hours on December 7, 2002,  no vessel could

berth at FGDI's grain elevator.  Partial opening of the grain elevator was permitted, according to plaintiff,

at 1230 hours on December 13, 2002.  According to defendant, partial opening was at 1500 hours on

December 12, 2002.  The grain elevator was opened to its full extent by 1630 hours on December 14,

1

2002.

Three vessels scheduled to load at the grain elevator, M/V TAMPICO ALTO, the M/V ANGELIC PEACE, and the M/V/ PRINCESS VANYA, were allegedly affected by the shutdown following the oil spill.  Prior to a vessel being permitted to load a cargo of grain, the cargo spaces must be inspected and passed by representatives of the U.S. Department of Agriculture and the National Cargo Bureau.   The TAMPICO ALTO was inspected and issued the requisite passes for loading a cargo of grain at 0845 hours on December 11, 2002.  The TAMPICO ALTO berthed at the grain elevator at 1230 hours on December 13, 2002, and completed loading her cargo of grain on December 14, 2002, at 1545 hours.  The ANGELIC PEACE berthed at the grain elevator at 0630 hours on December 15, 2002, commenced loading at 0830 hours on December 15, 2002, and completed loading her cargo of grain at 2330 hours on December 18, 2002.  The PRINCESS VANYA was inspected and received the requisite passes for the loading of a cargo of grain at 1230 hours on December 15, 2002, berthed at the grain elevator at 0645 hours on December19, 2002, and completed loading operations at 1245 hours on December 24, 2002.

Plaintiff, FGDI, claims the following damages:

Vessel dispatch and demurrage:

|  |  |
|---|---|
| M/V PRINCESS VANYA | $  6,250.00 |
| M/V TAMPICO ALTO | $  6,000.00 |
| M/V ANGELIC PEACE | $  4,750.00 |

Interest on delayed payments:

|  |  |
|---|---|
| M/V PRINCESS VANYA | $  7,512.14 |
| M/V TAMPICO ALTO | $     170.50 |
| M/V ANGELIC PEACE | $  7,512.14 |

| | |
|---|---|
| Elevator overtime: December 15-18 | $ 40,600.00 |
| State Docks rail delay charges: | $ 22,493.88 |
| Railcar company charges for holding trains due to spill | $196,010.00 |
| Private FGDI lease railcar delay costs: | $   9,406.96 |
| TOTAL: | $300,411.54 |

### Testimony of Steven J. Speck

Steven J. Speck is the president and CEO of FGDI.  According to Speck, on December 7, 2002, when the berth was closed by the Coast Guard, FGDI had in inventory 17,804 metric tons of soybeans, 902 metric tons of wheat, and 9,640 metric tons of corn.  FGDI received product by railroad. FGDI had multiple vessels "in the pipe line" that they intended to load.  They did not have sufficient product in inventory to load the vessels, but relied on a continuous movement or incoming flow of railcars. However, when the Coast Guard closed the berth, everything stopped.   The severity of the spill and how long the grain elevator would be closed was unknown.  The railroads stopped delivery because there was nowhere to put the cars.  Four strings of railcars were delayed, two on the Canadian National line and two on the BNSF line.  The two strings on the Canadian National line would have probably arrived on the 9th if they had not been stopped.  The Canadian National railcars were actually stopped on the 4th, before the spill .  The holding yard at the Alabama State Docks which holds about 800 railcars and usually has between 300 and 400 full of grain, was full.   There was already some congestion with railcars, before the oil spill.  The elevator was full and the holding tracks were full.  If not for the spill, they would have continued to move the railcars. The other two strings of cars, on the BNSF line were stopped

en route by BNSF on December 11 and December 13th respectively.  These four trains were not going

to move again until the ANGELIC PEACE completed, or substantially completed, loading.  FGDI claims

railcars were delayed due to the closing and resulted in FGDI incurring delay charges for two railcar

invoices in the amount of $70,850 (for a delay of 13 days) and $75,600 (for a delay of 14 days.).  After

the berth was reopened, the backlog of railcars resulted in additional delays for two more railcar invoices

and additional charges of $23,100 and $26,460.

> Once we were closed and trains were stopped, it takes considerable additional amount of
> time to get the liquidity and the normal flow of the traffic in the elevator back up.  The
> railroad would want to clear out Mobile to make sure they could absolutely bring grains
> -- bring the trains in to be unloaded at Mobile so they wouldn't have to stop -- they
> would tend to be conservative, so we wouldn't take a chance of stopping them again.

 (T 25).

When the birth was partially opened on December 13, 2002, the TAMPICO ALTO was chosen

to load because it was a smaller ship that would fit the partial opening.  Although portions of the berth

may have been opened to vessel travel at 1430 or 1500 hours the day before, on December 12, 2002,

the Federal Grain Inspection Service requires that FGDI schedule their labor and government inspections

by three in the afternoon.  Prior to the spill, the TAMPICO ALTO had proceeded straight to lay berth

upon its arrival.  The TAMPICO ALTO passed inspection as to holds one and two on December 11,

2002.  The partial reopening occurred one day, six hours, and 15 minutes after the TAMPICO ALTO

passed inspection.  The general practice for the grain elevator here in Mobile was that the first vessel to

pass inspection is the first vessel that goes to the load berth.  When the TAMPICO ALTO was ordered

into load berth, the ANGELIC PEACE had not passed inspection.

FGDI's plan was to load soybeans first.  FGDI claims the TAMPICO ALTO was delayed three

days by the spill.  It took the TAMPICO ALTO one day and nine hours to load.  According to Mr.

Speck, if there had been no spill and the ANGELIC PEACE was loaded first, the TAMPICO ALTO

would have begun loading on the 12th and finished on the 15th.  The TAMPICO ALTO needed 2620

metric tons of wheat and FGDI only had 902 in storage.   Each railcar holds between 89 and 90 metric

tons of wheat.  These railcars were at FGDI's Mobile warehouse and, using a conservative calculation,

were delayed four days by the spill.  The total charges invoiced by the State Docks Terminal Railway for

the delay is in excess of $170,000 and it reflects 1,034 railcars of grain..  At a per diem rate, and

charging only four days out of the 31-day total represented on the invoices, the rail delay loss comes to

$22,493.98.

The ANGELIC PEACE arrived at 0500 hours on December 9, 2002, and would have been

loaded first if not for the spill.   The ANGELIC PEACE was ordered into port to lay berth on December

10 at 0900 hours.   The ANGELIC PEACE could have come into lay berth on the 9th, but vessels try to

avoid lay berth due to the additional shifting costs that are associated with moving from a lay berth to a

load berth at a later point in time.  She came in on the 10th and was inspected, and all seven cargo holds

were failed.  They brought in a shore crew to clean the holds.   On the 12th, the ANGELIC PEACE was

reinspected and all but one of her seven cargo holds failed.  The ANGELIC PEACE did not completely

pass inspection until 1230 hours on the December 13, however, according to Mr. Speck, if the berth had

been open, they would have brought the ANGELIC PEACE in, shore labor would have helped with the

cleaning, and it would have passed inspection earlier.   It would not have taken the same amount of time

(three days, three hours and 30 minutes):

Because included in your calculation is her failing inspection on the late afternoon after she

5

traveled to the berth, then the additional -- the additional time to get the cleaning crew in place. So hypothetically as well, if she was allowed to come directly to the berth on the 9th, the inspections would have been carried out very close to the time of arrival, and if she failed she would have failed early on the 9th and subsequently cleaning would have started, commenced immediately where she was at berth. So there would have been a considerable time saving versus time lost, waiting for one day for inspections, for the -- on the second day, which is the launch team couldn't make it due to heavy seas, and ultimately the vessel did, after this delay, decide to come into a lay berth versus continuing to try and inspect at sea.

(T 70-71).  She would have had the same transit time from sea to the elevator as she had from sea to the lay birth.  The ANGELIC PEACE berthed at the grain elevator load berth at 0630 on December 15 and completed loading at 2330 hours on the 18th.  It took the ANGELIC PEACE three days, 17 hours from the time she berthed at the elevator until she completed loading her cargo of grain at 2330 hours on December 18, 2002.  A total of 52,177 metric tons of soybeans were loaded on the ANGELIC PEACE.  Between 550 and 570 railcars would have been used to fill the ANGELIC PEACE.  On December 7, 2002, all the cargo for the ANGELIC PEACE was in Mobile or stopped just short of Mobile.

FGDI also incurred additional demurrage and dispatch charges for the ANGELIC PEACE.  The demurrage rate, which was $9,500 for the ANGELIC PEACE, is the penalty paid if FGDI does not load the vessel within the allotted time period.  Dispatch rate is usually half, $4,750 for ANGELIC PEACE, and is credited if FGDI loads the vessel in less than the allotted time.  There was a one-day loss of dispatch for the ANGELIC PEACE resulting in a loss of $4,750.  The demurrage and dispatch charge for the TAMPICO ALTO was $6,000 for a delay of two days.  For the PRINCESS VANYA, FGDI lost one day of dispatch in the amount of $6,250.

FGDI claims it lost interest because payments were delayed to FGDI.  FGDI's claim is for the

6

loss of use of funds for a period of four days for the ANGELIC PEACE.  Using the commercial interest

rate of one over New York prime, the interest charge for the ANGELIC PEACE was $7,134.06. (T 50,

101).  For the TAMPICO ALTO, the interest was $170.50 and for the PRINCESS VANYA the

interest was $7,512.14. (T 50).

FGDI also incurred additional overtime charges on December 15, 16, 17, and 18, 2002, as a

result of the oil spill. (T 51).  FGDI claims five overtime shifts were used as a result of the spill. (T 97).

Although the berth was opened on the 14th, overtime was necessary to clear the soybean backup

resulting from the closing. (T 52-53).  Mr. Speck testified that it is possible overtime shifts would have

been necessary to load the ANGELIC PEACE even if there had been no spill. (T 97).  Mr. Speck could

not speculate how much overtime would have been necessary. (T 97).  Overtime was not necessary for

the TAMPICO ALTO which left on December 15, 2002, because it was a small vessel that was being

loaded with wheat, and had little effect on their usable space and the flow of the "pipeline." (T 53).  Using

overtime for moving and unloading soybeans between December 15 and December 18, minimized the

impact of the spill and got some of the railcars moving. (T 53-54).  The overtime incurred for December

15th was $17,200; for December 16th it was $7,800; for the 17th it was $7,800; and for the 18th it was

$7,800. (T 58).  FGDI used the tariff rate to calculate the overtime charges. (T 98).  The overtime relates

to the loading of the ANGELIC PEACE, which was loaded from December 14 - 19, 2002. (T 58).

Although there were additional overtime charges after December 19, 2002, FGDI believed it was

possible that they would have incurred some overtime regardless of the spill.  Thus, FGDI only claims the

overtime incurred for the four days that were directly attributable to the delay. (T 59).

FGDI denies that their Christmas party, the night of December 14, 2002, resulted in any delay in

the departure of the TAMPICO ALTO or the loading of the next vessel. (T 60).  The TAMPICO ALTO

sailed at 2135 hours, and FGDI's overtime shift ends at 11:00 pm. (T 60).  The TAMPICO ALTO

finished loading at 1535 hours, and it would have taken it at least two hours to get ready for sea and sail

from the grain elevator facility. (T 63).  TAMPICO ALTO is a cumbersome ship and it took a

considerable amount of time to open the hatches and close the hatches and become ready for sea. (T 63-

64).  If a vessel has to shift from a lay berth, the shift takes one to two hours. (T 60).

### Testimony of Michael Barrie

Michael Barrie is a marine surveyor with extensive experience in the maritime industry.  Mr.

Barrie's company was appointed to monitor and supervise the cleanup operation of the hull of the

LORELAY, the berths, and adjacent areas so that normal operations could continue as soon as possible.

He acted for the owners of the LORELAY and the underwriters and his duties included monitoring the

cleanup operators to make sure that the charges billed were actually incurred.  Barrie did not personally

arrive at the scene until about noon on December 9th.  Mr. Barrie reviewed FDGI's claim and issued an

expert report on March 22, 2004.  Since that time, he has also reviewed the expert report of Ms. Bulow

and her deposition testimony.

Mr. Barrie believes the TAMPICO ALTO was delayed one day, 6 hours and 15 minutes, or

1.26 days.  Barrie bases this opinion on the fact that a vessel must tender notice of readiness and present

a stowage inspection report before it can be loaded.  The TAMPICO ALTO was inspected and passed

at 0845 on December 11, 2002.  According to Barrie, when they realized that a vessel that would not

require the full length of the berth had passed inspection and was ready to load, they concentrated their

cleanup efforts on the 300 feet north of the grain elevator and areas upstream of that area.  At that time, it

8

was prudent to mitigate any down time by getting the small vessel in there to load.  The northern 300 feet

of the berth reopened at 1500 hours on December 12, 2003.  There was no representative of the

TAMPICO ALTO at the meeting with the Coast Guard when the decision to partially reopen the berth

was made.  The opening of the northern 300 feet was published or sent out at 1636 hours on December

12, 2003.

In Mr. Barrie's opinion, neither the ANGELIC PEACE nor the PRINCESS VANYA suffered

any delay.  By the time the ANGELIC PEACE passed inspection, at 1230 hours on December 13th,  the

TAMPICO ALTO was already at berth.  By the time the TAMPICO ALTO finished, the cleanup of the

entire berth was complete.  The entire berth was open at 1625 hours December 14, 2002.

The TAMPICO ALTO is an older vessel and takes extra time, one - three hours, to close its

hatches.  The TAMPICO ALTO sailed at 2135 hours December 14, 2002.  The ANGELIC PEACE

commenced loading at 0800 hours on December 15, 2002, which is one day, 19 hours and 30 minutes

after it passed inspection.  If the intention had been to load the larger soybean vessel first, then there

would have been a delay to the ANGELIC PEACE.   The soybeans in the bin had to be emptied first

before they could receive more soybeans from the railcars. The normal procedure is for grain to be

loaded into the bin first to be graded and weighed before it is loaded on a vessel.   It would take about

one day to unload the 17,000 metric tons of soybeans in the bin.  It took four days to load the

ANGELIC PEACE.  It took the PRINCESS VANYA five days to load.

In addition to the soybeans in the elevator bin, approximately 1034 railcars would be needed to

produce sufficient quantity of soybeans to load the PRINCESS VANYA and ANGELIC PEACE.

There were 1015 cars in the parking lot, 19 of which contained wheat.  For the Canadian National

9

railcars, there was a daily storage cost of $50 per car.  For the Burlington Northern and Santa Faye

railway company, it was $35 per car.  At $35 per car, 1034 cars would be $36,190 per day.  At $50,

the price per day would be $51,700.  The average would be $43,945 per day.  If 1034 cars were held

up 6 days, the average cost would be $263,670.

Barrie could not determine that there was any delay in the Canadian National railway cars

because the cars were already stopped before the oil spill.   They could not be moved until an

appreciable number of railcars had been unloaded which would not occur until the ANGELIC PEACE

began loading on December 13th.   Also, the cargo was soybeans which was not needed for the

TAMPICO ALTO.

Barrie states that the one day, 6 hours and 15 minutes may be applicable to the BNSF railcar

invoices.   The BNSF railcars were loaded and moving after December 7th.  They were stopped because

of the congestion in the port and the rail track and rail yard, which existed prior to the spill.

Barrie did not understand the demurrage charges of the Alabama State Docks for the railcars

and, therefore, said he had no opinion as to those charges.  The description for the charge indicates it is a

car hire offset, which in Barrie's opinion would be a credit or rebate.  There is also no indication as to

how the figure was calculated.

Mr. Barrie believed that a demurrage of one day, 6 hours and 15 minutes was applicable to about

19 of FGDI's own railcars.  The rest of FGDI's railcars did not carry wheat which was to be loaded on

the TAMPICO ALTO, the only vessel that was delayed.

If each of the railroad lines were delayed 1.26 days, the demurrage total would be $32,764.67.

As to the claims for overtime, Barrie believes the charges should not be considered.  FDGI could

have completed loading in straight time.  Mr. Barrie stated, however, that four time shifts of overtime would have been necessary to load the ANGELIC PEACE within four days as intended.

Mr. Barrie believes the claim for dispatch should not be considered with regard to the ANGELIC PEACE because it was Farmers Grain who delayed the loading of the TAMPICO ALTO and, thus, the loading of the subsequent vessels.  The 300 feet of berth at the grain elevator was opened at 1500 hours December 12, 2002, but the TAMPICO ALTO was not ordered into berth until 1000 hours December 13, 2002.  No other vessel had passed inspection at that time.   Mr. Barrie believes dispatch should not be considered for the PRINCESS VANYA for the same reason.  Mr. Barrie does not have any experience or qualifications in the railcar industry, the sale of grain, or grain transport industry other than in the area of inspection and stability calculations.

### Testimony of William B. Lott

Mr. Lott is president of Lott Ship Agency, a steamship agency in Mobile, and was the agent acting on behalf of the LORELAY at the time of this incident. (T2 1).  When there is a vessel loading at the elevator, the elevator must be notified by three o'clock if there will be overtime. (T2 4).  It would be difficult to get a staff there after three o'clock if they did not already have a crew working on a vessel. (T2 4).

The TAMPICO ALTO has older type hatch covers that are pontoons and have to be removed one by one and then put back in place one by one. (T2 5).  To open up both the hatches or close them would probably take two to three hours, depending upon how fast the crew is working (T2 5).   Once the hatch covers are in place, then there is a tarp that has to be rolled out and secured. (T2 5).  So, the whole operation takes longer. (T2 5).

A port log for a vessel would usually include the notice of readiness. (T2 6).   The notice of readiness means "[w]e're here, load me, discharge me. The clock's running." (T2 7).  It is the captain's representation that the vessel is ready to load. (T2 7).  The port log for the ANGELIC PEACE indicates the notice of readiness was tendered on December 9, 2002, at 0500 hours. (T2 7).  There are additional expenses associated with coming in for a lay berth. (T2 9).  For a vessel the size of the ANGELIC PEACE, it would probably cost an additional 12 to 15 thousand and then a couple thousand each day for dockage. (T2 9-10).  If a vessel comes into berth and does not pass inspection, then they will clean it at berth. (T2 10).

> But typically if you had a vessel that had discharged coal in New Orleans and had to [ ]
> come to Mobile to load grain, you know, it's going to take several days for them to clean.
> And the elevator wouldn't just allow a vessel to come to the berth if they knew it was
> going to take them a week to clean.

(T2 10).  If some of the holds pass inspection and some do not, it is possible for the vessel to commence loading the holds that have been passed and at the same time continue to clean the other holds. (T2 10).  The ANGELIC PEACE failed inspection on December 10th. (T2 11).  It was inspected again on the 12th and all but one hold failed. (T2 11).  It is unlikely that they would have started to load the one clean hold, unless the others would only take a an hour or less to clean. (T2 11).

### Deposition Testimony of Carasso Bulow, Ph.D.

Ms. Bulow is a commercial marine arbitrator with 30 years experience arbitrating maritime and commodity disputes. (Bulow Depo. p. 5).  Ms. Bulow spoke to Mr. Speck and  reviewed Mr. Speck's claim documents, port logs for the three vessels, as well as railcar documents. (Bulow Depo. p. 7-9).  According to Bulow, if there had been no partial closing, the ANGELIC PEACE, which was to receive

about 46,000 metric tons of soybeans, would have loaded first. (Bulow Depo. pp. 15, 42-43).   The

intention was to load soybeans first. (Bulow Depo. p. 15).  The elevator had an inventory of 17,804.5

metric tons of soybeans, 902 metric tons of wheat, and 244 metric tons of corn. (Bulow Depo. p. 15,

43-44).  The grain elevator was not holding its full capacity of grain, which is 27,200 metric tons. (Bulow

Depo. p. 47).  However, some of the bins were unusable, so Ms. Bulow did not know how much more

of each grain the elevator could have held. (Bulow Depo. p. 47).  The rest of the grain needed for loading

was in railcars, some of which were parked at the terminal railway next door to the elevator and others of

which were on their way. (Bulow Depo. p. 48).  It is customary for there to be rail cars in the pipeline

coming in to supplement a load with what is in house. (Bulow Depo. p. 17).  A standard railway car

holds 89 metric tons of grain. (Bulow Depo. pp. 50-51).

The ANGELIC PEACE was the first to arrive, at 500 hours on December the 9th, and it is

customary that the first to arrive be the first to load. (Bulow Depo. pp. 53, 70).  Which vessel is actually

loaded first depends on the logistics of the elevator, for instance, here they would want to take the larger

ship and get more commodity moving. (Bulow Depo. p. 54).  It is much cheaper to leave a smaller vessel

waiting because the daily rates are much higher on a big vessel. (Bulow Depo. p. 54).  However, the

ANGELIC PEACE could not be taken in when the berth partially opened because it was too large for a

300 foot berth. (Bulow Depo. pp. 17-18).  Instead, the TAMPICO ALTO loaded soft red wheat, and

the soy bean cars had to stay put. (Bulow Depo. p. 19).  The TAMPICO ALTO passed inspection first -

at 0845 hours on December 11th. (Bulow Depo. pp. 54-55).  Then the TAMPICO ALTO had to wait

until the partial opening to load. (Bulow Depo. p. 57).  The northern 300 feet of the berth opened at

10:00 o'clock on December 13, 2002. (Bulow Depo. p. 58).  The decision to reopen the northern

section of the berth was actually made on December 12, 2002, at 1430 hours. (Bulow Depo. p. 61).

However, that information was not communicated to the TAMPICO ALTO until 1:00 o'clock on

December 13th. (Burlow Depo. pp. 96-97). It takes time for information to get to the elevator and it

takes time to change its program and to get the grain ready to load. (Bulow Depo. p. 63, 100). It

appears that the partial opening was not even communicated to the Coast Guard offices until 4:30 in the

afternoon on December 12th. (Burlow Depo. p. 97-98). A grain elevator is a complicated operation and

it takes time to get things ready for a vessel to come in that they were not planning to come in. (Bulow

Depo. p. 63). Vessels are usually shifted in the morning. (Bulow Depo. p. 64). The ANGELIC PEACE

had not passed inspection at that time, but would have known that they could not proceed to the berth for

a long time. (Bulow Depo. p. 57-58). Still the ANGELIC PEACE would have some incentive to pass

inspection as soon as possible because the clock starts ticking for purposes of dispatch and demurrage as

soon as they pass inspection. (Bulow Depo. p. 69, 71). At 1230 on the 13th, the ANGELIC PEACE

had passed inspection and would have gone in if the berth was open for larger vessels. (Bulow Depo. p.

58). It took the TAMPICO ALTO an hour to shift from the lay berth to the grain elevator. (Bulow

Depo. p. 62). The loading of the relatively small amount of grain on the TAMPICO ALTO would not

have freed up much space to allow the rail cars to move, but still the best way to mitigate damages was to

go ahead and bring this smaller vessel in and load it. (Bulow Depo. p. 20-21). The loading of the

ANGELIC PEACE and the PRINCESS VANYA went smoothly and there were no additional delays

except that they had to wait that extra time for the TAMPICO ALTO to be loaded. (Bulow Depo. p.

66).

      The charges claimed by FDGI for delay in railcars take into consideration the fact that some of

the cars were already stopped before the spill. (Bulow Depo. p. 22-23).  Mr. Speck's figures include

time between December 7th and the date they moored. (Bulow Depo. p. 23).  The BNSF charges on

invoice # 472628 from December 7th to December 20th pertain to the oil spill and partial closing. (Bulow

Depo. p. 23).  The charge for that period is $70,850. (Bulow Depo. p. 24).  That figure represents $50

per car per day for 109 cars. (Bulow Depo. p. 25).  On BNSF invoice 467089, the charges from

December 7 to December 21 relates to the oil spill and that portion comes to $75,600. (Bulow Depo. p.

26).  All of invoice 474595, which covers from December 13-19, pertains to the spill and the closing

(Bulow Depo. p. 26-27).  Invoice 458002 for $26,460 is also all related to the oil spill because it was

held on December 11 and departed December 18. (Bulow Depo. p. 27).  The total reasonable railcar

demurrage is $196,010. (Bulow Depo. p. 28).

Cars at the terminal railway facility were stopped for four days.  Although the spill occurred on

the 7th, the ANGELIC PEACE did not arrive until December 9.  The ANGELIC PEACE probably

would have started loading on the 11th if there had been no spill, but, because of the spill, it commenced

loading on the 15th. (Bulow Depo. p. 29).  Instead, the ANGELIC PEACE stayed at anchorage and then

the inspectors went to launch, but there was heavy seas and they had to come back the next day. (Bulow

Depo. pp. 70-71).  The ANGELIC PEACE was brought in to a lay berth at 0900 December 10th.

(Bulow Depo. p. 74).  The ANGELIC PEACE did not pass inspection until three days and three hours

later at 1230 hours on December 13th. (Bulow Depo. p. 74-75).

Shore labor probably could have cleaned the ANGELIC PEACE quicker. (Bulow Depo. p. 30).

Four days of terminal railway charges for soy and corn to be loaded on the ANGELIC PEACE is

$22,493.88. (Bulow Depo. p. 31).  Ms. Bulow also believes the charge for delay of FDGI leased cars

held during the oil spill is reasonable. (Bulow Depo. p. 31).  One day dispatch loss for both the

ANGELIC PEACE and the PRINCESS VANYA is also reasonable. (Bulow Depo. p. 32).  In fact, the

ANGELIC PEACE probably actually lost two days of dispatch rather than the claimed one day. (Bulow

Depo. p. 35).  The PRINCESS VANYA probably also lost more than one day. (Bulow Depo. p. 36).

One day dispatch on the PRINCESS VANYA is $6,250. (Bulow Depo. p. 37).  The TAMPICO

ALTO actually loaded sooner than she would have so there should be no dispatch and demurrage

resulting from the spill for the TAMPICO ALTO. (Bulow Depo. p. 38).

According to Bulow, the $7,134.06 interest charge for the ANGELIC PEACE is correct.

(Bulow Depo. p. 38).  However, again there should be no charge for interest for the TAMPICO ALTO

which loaded first and would not have if not for the spill. (Bulow Depo. p. 39).  Ms. Bulow also thinks

the interest claim for the PRINCESS VANYA is overstated. (Bulow Depo. p. 39).  FDGI received an

advance payment on December 23, and they would not have been paid sooner than that because of the

weekend. (Bulow Depo. pp. 39, 78-79).  The lost interest is only on the balance of $450,248.91 for the

PRINCESS VANYA. (Bulow Depo. p. 39).  Ms. Bulow calculates the lost interest pertaining to the

PRINCESS VANYA to be $259.05.  An interest rate of prime plus one is customary in grain contracts.

(Bulow Depo. p. 40).  The total amount of interest due to FGDI for delay in payment at the commercial

loan rate of 5.25 is $7,393.11. (Bulow Depo. pp. 79-81).

The elevator overtime charges for unloading railcars are reasonable. (Bulow Depo. p. 40).

Under FGDI's general terms and conditions for vessels using its facilities, the tariff rate for overtime is

$975 per hour on Monday through Friday and $1,075 per hour on Saturday, Sunday, and holidays.

(Bulow Depo. pp. 84-85).  Ms. Burlow did not know what the actual cost to FDGI was for the

16

overtime. (Bulow Depo. p. 86).

## DISCUSSION

Under the Federal Oil Pollution Act of 1990:

[E]ach responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).  Claimant does not contest its responsibility for the oil spill which emanated from the LORELAY on December 7, 2002, but contests the nature and extent of plaintiff's damages.  In this case, the damages sought are lost profits or earnings which are recoverable under § 2702(b) of the Oil Pollution Act.   Plaintiff has the burden of proving such damages with reasonable certainty. Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813, 822 (11th Cir. 1984); John W. Stone Oil Distributor, Inc. v. M/V MISS BERN, 663 F.Supp. 773, 780 (S.D. Ala. 1987); but see Bruzzone Consolidation, Inc. v. M/V Blue Eagle, 713 F.Supp. 146, 151 (D.Md.,1989) ("But in the circumstances, the imperfections of proof should not inure to the benefit of the tortfeasor. Once a plaintiff shows the fact of damage, the precise amount of damage need not be shown with mathematical certainty. On the other hand, damages should not be the subject of conjecture or speculation. The plaintiffs must present sufficient evidence from which damages can be determined on a rational basis." citing Amstar Corp. v. M/V ALEXANDROS T, 472 F.Supp. 1289 (1979), aff'd 664 F.2d 904 (4th Cir.1981)) U.N./F.A.O. World Food Programme v. M.V. TAY,  1997 WL 714901, *5 (S.D. Tex. Feb. 11,1997) (same).

The parties agree that FGDI suffered some delay in the loading of vessels as a result of the oil spill but disagree as to the extent of the delay.  The crux of the dispute between the parties appears to be

17

whether the TAMPICO ALTO or the ANGELIC PEACE would have loaded first if not for the spill.  It is undisputed that under the circumstances as they actually occurred that it was prudent to load the TAMPICO ALTO first.  However, the testimony is conflicting with regard to what would have occurred if there had been no spill.  There is testimony that the first vessel to pass inspection is customarily the first vessel to load.  There is also testimony that the first vessel to arrive or the first vessel to tender readiness is first to load.   Testimony also indicates that which vessel is actually loaded first depends on the logistics of the elevator, for instance here they would want to take the larger ship first to get more commodity moving.   In addition to being able to unload more commodity by bypassing the smaller vessel, it is much cheaper to leave a smaller vessel waiting because the daily rates are much higher on a big vessel.  In this case, most of the grain in the bins at the elevator consisted of soybeans, and there was a significant backlog of railcars that contained a large amount of soybeans - grain that would not be moved until the ANGELIC PEACE came in.  Although it did not pass inspection until December 13, 2002, the ANGELIC PEACE actually arrived first and tendered readiness on December 9, 2002.  Unless it was known ahead of time that it would take a considerable amount of time to clean the ANGELIC PEACE, it was clearly in FGDI's best interest to bring the ANGELIC PEACE in first.   The ANGELIC PEACE was the logical choice to load first and, according to Mr. Speck, it was, in fact, the vessel FGDI intended to load first.  Therefore, after reviewing the testimony in this case, the court concludes that the ANGELIC PEACE would have been brought in first had it not been for the closing of the elevator berth due to the oil spill.

If the oil spill had not occurred and the ANGELIC PEACE loaded first, she would have come straight into berth at the elevator upon arrival at 0500 hours, December 9, 2002.  Plaintiff claims the

ANGELIC PEACE was delayed five days because it did not commence loading until December 15th. However, the ANGELIC PEACE would presumably have failed inspection initially, as it did when ordered to lay berth, and the shore labor would have commenced cleaning the vessel.  It took 3 days, 3 hours and 30 minutes from the time the ANGELIC PEACE was ordered to lay berth until it passed inspection.  The testimony indicates that it would not have taken as long if it had been berthed at the grain elevator because of the availability of shore labor and the vessel's accessibility for inspection.  The inspectors would not have had to wait a day because of high seas.  The court finds that it is reasonably certain that the ANGELIC PEACE would have passed inspection and been ready to load on the 11th as Ms. Bulow testified.  Because of the oil spill, the ANGELIC PEACE commenced loading four days later, on the 15th.   Thus, the court finds that the ANGELIC PEACE was delayed approximately four days by the oil spill.

        If not for the spill, the ANGELIC PEACE would have completed loading on December 15, 2002.  The berth would then have been open for the TAMPICO ALTO which would have passed inspection by that time.  It took the TAMPICO ALTO only one day to load, and, thus, it would have completed on December 16, 2002.  The TAMPICO ALTO actually completed loading on December 14, 2002, two days earlier.  Thus, the court finds that the TAMPICO ALTO was not delayed by the oil spill.

        FGDI claims the PRINCESS VANYA was delayed four days.  However, the court finds the delay was only three days.  Although the PRINCESS VANYA arrived on December 11, 2002, and passed inspection on December 15, 2002, it could not have berthed at the grain elevator until the ANGELIC PEACE and the TAMPICO ALTO completed loading and left the elevator.   On December

19

16, 2002, the elevator berth would have been open for the PRINCESS VANYA.  Because of the oil spill, the PRINCESS VANYA did not berth at the grain elevator until December 19th.  Thus, the court finds that the PRINCESS VANYA was delayed three days by the oil spill.

After considering the testimony at trial, the court finds that the above delays did not result from any factor unrelated to the oil spill, such as FDGI's Christmas party.  Having determined that the ANGELIC PEACE and the PRINCESS VANYA were delayed 4 days and 3 days respectively, the question is what damages resulted from the delays.

**A. Dispatch and Demurrage**

FGDI claims one day of dispatch lost for the ANGELIC PEACE, two days demurrage paid for the TAMPICO ALTO, and one day demurrage lost for the PRINCESS VANYA.  The court has determined that the TAMPICO ALTO was not delayed by the oil spill, thus, no demurrage will be allowed for that vessel.  As to the other two vessels, the court finds that the claimed amounts are reasonably certain.  Although FGDI claims the vessels were delayed slightly longer than the court has determined the evidence demonstrates, the court finds that one day demurrage lost for each of the two vessels is appropriate.  Ms. Bulow, who believed the ANGELIC PEACE would have been ready to load on December 11, 2002, as the court has determined, was of the opinion that more than one day of demurrage was actually lost for the ANGELIC PEACE.  Ms. Bulow also stated that the PRINCESS VANYA actually lost more than one day of demurrage.   After review of the evidence,  the court finds that FGDI lost demurrage in the amount of $4,750.00 for the ANGELIC PEACE and $6,250.00 for the PRINCESS VANYA, for a total dispatch and demurrage loss of $11,000.00 resulting from the oil spill.

**B. Interest**

For the delay in receipt of payment for the grain loaded on each vessel, FGDI claims four days of interest for the ANGELIC PEACE, three days of interest for the TAMPICO ALTO, and four days of interest for the PRINCESS VANYA.  As previously explained, the court will not allow any damages for delay of the TAMPICO ALTO, as it was not delayed by the oil spill.   FGDI stated in its brief that the number of days interest for each vessel was consistent with the number of days each vessel was delayed. The court has found that both the ANGELIC PEACE and the PRINCESS VANYA were delayed one day less than claimed by FGDI.  Therefore, the amount of interest associated with each vessel should be decreased by one day.   In addition, FDGI received an advance payment for the PRINCESS VANYA. According to Ms. Bulow, FGDI would not have received that payment any sooner.  Thus, the lost interest for the PRINCESS VANYA is only on the balance after the advance payment.

The parties dispute the interest rate to be applied.   FGDI claims interest at a rate of 5.25%, which is one percent over New York prime.  Testimony demonstrated that this rate was the commercial standard used in the trade and was used in NAEGA contracts.  However, the interest claimed was not due to FGDI pursuant to a contract, but simply represents FGDI's loss of the use of that money during the delay.  FGDI has not demonstrated that it would have gained interest at that rate by using the money, such as by loaning it to another entity, paying it toward a debt that was incurring interest, or that it would have been deposited in an account that paid an interest rate of that magnitude.  Thus, the court finds FGDI has not shown with reasonable certainty that its interest loss was at a rate of  5.25 %.   The court will award FGDI's interest at the six-month U.S. Treasury bill rate in December 2002 of 1.2%.   Thus, FGDI suffered interest damages in the amount of $1,223.08 (3 days on an invoice value of $12,400,622.33) for the ANGELIC PEACE and $44.41 (3 days on an invoice value of $450,248.91)

for the PRINCESS VANYA for a total interest loss of $1,267.49.

## C. Overtime

FGDI claims that, as a result of the delays caused by the oil spill, it incurred overtime charges in the amount of $40,600.00.   This amount represents payments to workers for five overtime shifts incurred between December 15, 2002, and December 18, 2002, while loading the ANGELIC PEACE.  Mr. Speck was not completely certain how much overtime resulted from the oil spill and how much would have been used regardless of the spill.  Ms. Bulow was of the opinion that the overtime charges were reasonable.  Mr. Barrie did not believe that the overtime should be considered; however, Mr. Barrie did not believe that the ANGELIC PEACE had even been delayed by the spill.  After reviewing all of the evidence, the court finds that there is reasonable certainty that it was necessary for FGDI to use at least three additional shifts of overtime as a result of the oil spill.

Claimant also argues that the rates charged for overtime were not supported by evidence of FGDI's actual payment of overtime but instead by evidence of the standard rates charged for overtime.  There was no evidence that the overtime actually paid was different than the amounts calculated using the standard rates.  The court finds it is reasonably certain that the standard rates were the rates actually charged.   Thus, the court finds that FGDI is entitled to overtime charges in the amount of $25,000.00.[1]

---

[1] This figure includes overtime charged for the first two days claimed.  December 15, 2002, and December 16, 2002.  As stated in the facts, the overtime incurred for December 15th was $17,200; for December 16th it was $7,800; for the 17th it was $7,800; and for the 18th it was $7,800. (T 58). The court has presumed that charges for December 15th which is more than double than the amounts charged the other days, included two overtime shifts.   The court notes that December 15, 2002, was a Sunday which explains why the amount per shift that day was greater.

**D. Railcar Delay and Holding Charges**

FGDI claims State Docks rail delay charges in the amount of $22,493.88, railcar company charges for holding trains in the amount of $196,010.00, and private FGDI lease railcar delay costs in the amount of $ 9,406.96.  There was already some congestion with railcars before the spill.  In fact the Canadian National railcars were stopped on the December 4, 2002, before the spill.  However, according to the testimony of Mr. Speck and Ms. Bulow, the claimed amounts take into consideration the fact that some of the cars were stopped prior to the spill.  The cars on the terminal were stopped for four days as a result of the ANGELIC PEACE being delayed four days.  The other two strings of cars on the BNSF line were stopped en route by BNSF on December 11 and December 13th respectively.  These four trains were not going to move again until the ANGELIC PEACE completed, or substantially completed, loading.  Clearly, the railcars were delayed by the oil spill.  However, the ANGELIC PEACE was only delayed four days.  FGDI's railcar holding charges include two invoices covering 13 and 14 days of claimed delay and two more invoices incurred after the berth was opened that are claimed to be the result of the backlog of railcars after the berth was opened.  There is testimony that it takes "considerable additional amount of time to get the liquidity and the normal flow of traffic in the elevator back up."  However, the court finds that, considering the railcars were already backed up, FGDI has not shown to a reasonable certainty that the additional delay would be as extensive as FGDI claims.  The court finds that approximately half of the railcar company holding charges claimed are the result of the oil spill.  The total amount claimed for railcar company holding charges is $196,010.00.  Thus, FGDI is entitled to railcar company charges in the amount of $98,005.00 for holding trains until congestion from the spill was cleared.

23

The court finds that the amounts charged for State Dock rail delay and for delay of FGDI's private railcars are consistent with the delay of the vessels.  FGDI's claims for both charges are calculated using a delay of four days.  Thus, the court finds that FGDI is entitled to $22,493.88 for State Dock rail delay charges and $9,490.96 for delay of FGDI's private railcars.

## CONCLUSION

For the reasons stated above, the court finds that FGDI, L.L.C. is entitled to an award of damages in the following amounts:

| | |
|---|---|
| Vessel dispatch and demurrage: | $11,000.00 |
| Interest on delayed payments: | $ 1,267.49 |
| Elevator overtime: | $ 25,000.00 |
| Railcar company charges for holding trains due to spill: | $98,005.00 |
| State Docks rail delay charges: | $ 22,493.88 |
| Private FGDI lease railcar delay costs: | $   9,406.96 |
| **TOTAL:** | **$167,173.33** |

**DONE** and **ORDERED** this 16th day of September, 2005.

  /s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE